Filed 9/9/14  In re I.M. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re I.M. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G049631 |
| Plaintiff and Respondent, | (Super. Ct. Nos. DP022659, DP022660) |
| v. | |
| J.M., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Supervising Deputy County Counsel, for Plaintiff and Respondent.

*        *        *

Father J.M. appeals from the court's order at a Welfare and Institutions Code section 366.26 hearing (.26 hearing) terminating his parental rights to his children I.M. and A.M.[1] His appeal challenges, however, the court's rulings at the 12-month permanency hearing (1) finding that returning the children to his custody would be detrimental to their well-being, and (2) terminating his reunification services. Although father failed to file a writ petition challenging these rulings, due to the unusual circumstances we describe in this opinion, he has not forfeited his claims on appeal. After considering his claims on the merits, however, we affirm the court's order terminating his parental rights.

FACTS

In the six months between December 2011 and May 2012, the Orange County Social Services Agency (SSA) received four referrals concerning I.M. and A.M., and their half-brother, A.S. These referrals concerned the parents inflicting domestic violence on each other; the unsafe and unsanitary condition of mother's residence; and the children's appearance (they were filthy with unexplained marks and bruises and had severe diaper rash). SSA provided voluntary family services to mother.

On June 7, 2012, A.M. was a five-month-old infant, I.M. was one year old, and their half-brother A.S. was three years old. On that day, mother left the three

---

[1] All statutory references are to the Welfare and Institutions Code.

2

children with her roommate in their motel room, knowing the roommate had recently lost custody of his own child and that SSA had prohibited her from leaving the children in his care. Mother did not leave the roommate sufficient money to cover the children's needs. The roommate tried without success to contact mother.

When mother returned to the motel room late the next morning, she was arrested and taken to jail. The police found marijuana in her car. The children were detained at Orangewood Children and Family Center.

Because mother is not a party to this appeal, the remainder of our factual recitation focuses on father.

At the June 13, 2012 detention hearing, father was represented by privately retained counsel John Blanchard. The court found father was the presumed father of I.M. and A.M. and ordered that he have visits of no less than two hours a week (if authorized by a restraining order in place at the time). The court formally detained the children.

The next month, the children were placed with the *maternal* grandmother. The *paternal* grandmother had extended weekend visitation with the children. Both sides of the family maintained high conflict with each other. Mother and father accused each other of domestic violence. Mother claimed father drank alcohol and often passed out. In a petition for a restraining order against him, mother alleged father would stay up every night drinking and then sleep during the day.

Father asked SSA for additional resources for alcohol counseling. He wanted custody of the children and visited them regularly. He also attended anger management classes consistently.

SSA's petition, as amended on July 31, 2012, alleged the parents had failed to protect the children and provided them inadequate support. (§ 300, subds. (b), (g).) Inter alia, it alleged that "mother stated [father] drank one half gallon of Captain Morgan rum and a thirty-six pack of Miller Lite to the point of intoxication daily, while they lived together. The paternal grandmother . . . has stated she thinks the father has a drinking

3

problem.  The father admitted to [SSA] he had issues with drinking and requested referrals to a substance abuse program.  The father's use of alcohol to the point of intoxication puts the children at risk of harm due to his inability to provide adequate care or supervision."

On July 31, 2012, father retained new counsel Thomas Brown.  In a September 20, 2012 stipulation, father submitted and mother pleaded no contest to the amended petition.

At the September 20, 2012 jurisdictional and dispositional hearing, the court made orders and findings pursuant to the stipulation, including finding true the amended petition's allegations.  The court's disposition orders removed custody of the children from the parents, provided for reunification services for the parents, and adopted a case plan for father that included a domestic violence/anger management program; a parenting class; a drug treatment program; and random substance abuse testing.  Father's service objectives included maintaining a stable and suitable residence for himself and his children and to have a legal source of income.

At the six-month review hearing on March 20, 2013, the court, pursuant to the parties' stipulation, continued father's case plan and visitation plan in place without change.  Father had completed a parenting class and had attended anger management classes.  He acknowledged he had not addressed his substance abuse issues.  Although he had completed a 10-day alcohol detoxification program in January 2013, and moved into a sober living home, he had moved out of the sober living home after two months.  In January 2013, he had had a positive drug test and two missed tests.  At the close of the hearing, the court informed the parents that if the children could not be returned home by the 12-month permanency hearing, the case could be referred to a section 366.26 hearing, which could result in the termination of parental rights and adoption of the children.  The court continued, "So, it's important that you look at your case plan and make sure that you're covering all of those so that next time you come to court, when I get that report

4

like the report we got today, that it's going to say that you've made substantial progress and the kids are ready to go home or they are already returned home." The parents confirmed they understood this.

In its 12-month status review report dated August 6, 2013, SSA recommended that the parents' reunification services be terminated and that a .26 hearing be scheduled. Father had full-time employment, but had been "resistant to participating in substance abuse services and feels as if he does not have a problem with drugs or alcohol." SSA described father's case plan compliance as "minimal." The paternal grandmother "recognized that the father has had difficulty with alcohol and that when he recently went to Oregon, it was a binge trip," and that he had missed a visit on Father's Day, because he had spent the night with friends the night before and had been drinking. SSA stated father's "main problem is the alcohol, but that he does not feel he has a problem." Father tested positive for marijuana and amphetamines between April and July of 2013. He presented SSA with a marijuana prescription, and indicated he needed the drug to treat anxiety. Father provided documentation that he had attended 12-step meetings and obtained a sponsor. He appeared to "be engaged in outpatient substance abuse services," but stated he would complete "these classes to look good and be compliant." He seemed to be "most concerned with looking good to the Court."

On August 6, 2013, Paul St. Amant substituted in as father's counsel.

At the 12-month contested hearing in September 2013, attorney Jessica Nerney specially appeared for St. Amant on behalf of father. The social worker testified she did not believe a substantial probability existed that the children could be returned if the parents were given six more months of services. As to father, she stated he had not addressed his substance abuse issues and he was unable to support the children.

On September 20, 2013, the court found that return of the children to the parents would create a substantial risk of detriment to the children's safety, protection, and physical and emotional well-being, and that the parents had been provided or offered

5

reasonable services.  The court observed that SSA's report indicated father did not complete his substance abuse program and treatment, and that he had had positive and diluted tests.  The court found that father's progress on his case plan was minimal, and that the children would be at risk if returned to him because of his lack of progress in substance abuse treatment.  The court terminated reunification services for the parents.

The court explained, "I need to advise the parents of their right to file a writ.  [¶]  You have a right to writ today's ruling.  In order to do that you have the right to have an attorney appointed to represent you at little or no cost to yourself and the right to have a copy of the transcriptions of today's hearing, which would also be paid for by the court."  The court explained the deadline and procedure for filing a writ petition and that the parent "may be forever precluded from having the Court of Appeals review or consider any issues that arose from these proceedings if you do not file a writ."

Seven days later, on September 17, 2013, father filed a notice of intent to file a writ petition, listing his own name in the space for the name of the attorney or the party without an attorney.

At a court hearing that day, the court stated that father had submitted a substitution of attorney form.  The court stated on the record that "we did try to contact your attorney, Paul St. Amant, at the telephone number . . . on the form . . . and the telephone number is not going through.  Our call is not going through."  The court's efforts to reach Jessica Nerney had also been unsuccessful as Nerney's phone number was no longer working.

The court then denied father's request for substitution of attorney.  The court's reasoning was that father had "filed a petition for a writ and it would be verging on client abandonment to essentially substitute Mr. St. Amant's office out."  The court indicated its denial was without prejudice and the court would entertain another request in the future.  The court stated it would notify St. Amant of the ruling and would also contact him in writing.  The court suggested father inform St. Amant he (St. Amant) was

6

still on the case and still represented father, and that father had a pending writ petition that had "to be taken care of quickly." Father indicated he would try another phone number for St. Amant.

At a hearing a month later, St. Amant was present; he also signed a continuance stipulation as father's counsel. Two days later, on October 18, 2013, the Court of Appeal sent notice to the parties and father's *former* attorney Brown that any writ petition was due by October 28, 2013. The minute order for an October 29, 2013 hearing indicates that St. Amant was present, but the continuance stipulation contains the handwritten notation for St. Amant, "ok by phone," not his signature.

At a progress review hearing on November 20, 2013, St. Amant was not present and had not returned the court's or father's phone calls. Father told the court St. Amant had e-mailed him the night before saying he (St. Amant) was not going to show up because father owed him money and because St. Amant did not "know who to write a writ for." The court advised father that if he had any issues with the writ, he needed to communicate with the Court of Appeal. The court noted "that at the previous hearing Mr. St. Amant indicated to county counsel that he was unaware of the last court date, that he assured you and county counsel that he would appear on today's date." The court then stated it would issue a citation for St. Amant to appear on December 3, 2013.

On November 22, 2013, the court issued an order for St. Amant to personally appear on December 3, 2013. The court stated in the order that St. Amant still represented father.

On December 3, 2013, St. Amant failed to appear in court. The court recounted the history concerning St. Amant, including that father "had filed a notice of intent to file a writ petition, and that he had attempted to file a substitution of attorney form to represent himself. [¶] The court had unsuccessfully attempted to contact St. Amant, so denied the substitution of attorney request, as . . . the court found the substitution of attorney was inappropriate." The court had informed St. Amant by phone

7

that it had ordered his appearance. Subsequently court officers had "successfully and unsuccessfully attempted to contact [St. Amant, and he] had indicated he would appear on November 20th," but then failed to appear.

Accordingly, the court set an order to show cause (OSC) for January 6, 2014, on why sanctions should not be imposed on St. Amant for failing to appear. The court noted that the Court of Appeal had extended the writ petition deadline to December 9, 2013, and that the attorney of record was still St. Amant. SSA's counsel expressed a concern that if the court ended up appointing new counsel for father at the .26 hearing on January 6, this would delay the permanency of the children, and father "won't have had representation this entire time." The court replied, "He's represented."

On December 11, 2013, the Court of Appeal issued a new order, in case No. G049000, noting that no writ petition had been filed, and further expressing its intent to dismiss the matter unless the petitioner filed a writ petition on or before December 23, 2013. On December 30, 2013, because no writ petition had been filed, the Court of Appeal dismissed the matter.

On January 6, 2014, the court stated it had confirmed St. Amant was no longer eligible to practice law in California. Accordingly, the court took the OSC off calendar, relieved St. Amant as father's counsel, and appointed Ken Nielsen as new counsel for father. The court noted its appointment of Nielsen as father's counsel occurred "after the time for writ could have been pursued and had already expired in the Court of Appeal."

The court then proceeded to the .26 hearing, where it terminated parental rights and ordered that the children be placed for adoption.

8

DISCUSSION

*Father Did Not Forfeit His Challenges to the Court's Rulings at the 12-Month Permanency Hearing by Failing to File a Writ Petition*

Father challenges the court's findings at the 12-month permanency hearing that (1) returning I.M. and A.M. to his care would create a substantial risk of detriment to them, and (2) there was no substantial probability they would be returned to his care if the court extended his services. Father urges us to consider his contentions on the merits despite his failure to file a writ petition challenging the court's findings.

Normally, a parent must file a timely writ petition with the appellate court in order to challenge a juvenile court's rulings at a 12-month hearing *not* to return a child to the parent's care and *not* to continue the case. These rulings are prerequisites to a juvenile court's order setting a .26 hearing (setting order). (§ 366.21, subds. (f), (g)(4).)[2] A setting order is appealable only if a writ petition was timely filed and "was summarily denied or otherwise not decided on the merits." (§ 366.26, subds. (*l*)(A) & (C), (5) [applies to post-1994 orders]). A parent's failure to file a writ petition "preclude[s] subsequent review by appeal of the findings and orders made pursuant to this section." (*Id*., subd. (*l*)(2).) This is true even when the parent blames the failure on a lack of counsel or on ineffective assistance of counsel. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1151.) We will call this rule the forfeiture rule.[3]

---

[2] Another prerequisite to a setting order is the court's finding that reasonable services were provided or offered to the parent. (§ 366.21, subd. (g)(1).)

[3] Some cases refer to the "waiver rule" (see, e.g., *In re Meranda P.*, *supra*, 56 Cal.App.4th at p. 1151), but "the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2). "In contrast, a waiver is the '"intentional relinquishment or abandonment of a known right."'" (*Ibid.*)

An exception to the forfeiture rule applies when a court fails to notify a parent of the need to seek a writ in order to preserve a right to appellate review of a setting order. A court is required to give such notice to all parties under rule 5.695(h)(19) of the California Rules of Court. "When notice is not given, the parents' claims of error occurring at the setting hearing may be addressed on review from the disposition following the section 366.26 hearing." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 838.) The parent need not demonstrate prejudice from the lack of notice in order to be excepted from the forfeiture rule. (*In re Cathina W.* (1998) 68 Cal.App.4th 716, 724.) This is because, in order for a reviewing court to evaluate prejudice, it must first consider the challenged order on the merits regardless. (*Ibid.*)

*In re Janee J.* (1999) 74 Cal.App.4th 198, 208 suggested two guidelines for determining whether other defects might exempt a parent from the forfeiture rule. "First, there must be some defect that fundamentally undermined the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole." (*Ibid.*) "Second, to fall outside the waiver rule, defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed." (*Id.* at p. 209.) "[R]esort to claims of ineffective assistance as an avenue down which to parade ordinary claims of reversible error is also not enough and . . . it is never enough, alone, to argue that counsel rendered ineffective assistance by not raising potentially reversible error on . . . writ review of a setting order." (*Ibid.*) We interpret this second guideline, with its reference to "mere" or "ordinary" reversible error, as a further elaboration on the first guideline, clarifying that the defect must have *fundamentally* deprived the parent of statutory protections *and prevented* the parent from having access to such protection.

Applying these guidelines, we conclude father's contentions must be considered on the merits. The court's refusal to relieve St. Amant as father's attorney *prevented* father from filing a writ petition himself. "The petitioner's trial counsel . . . is

10

responsible for filing any . . . writ petition . . . ." (Cal. Rules of Court, rule 8.450(c).) "As a general rule, parties who are represented in court by counsel of record are required to proceed in court through their counsel." (*In re Barnett* (2003) 31 Cal.4th 466, 471.) Father tried to substitute out St. Amant as his attorney, but the court denied his request in order to protect father from client abandonment on a writ petition. Almost four months later, after the deadline for filing a writ petition had already passed, the court finally appointed father new counsel. During those four months, St. Amant's shortcomings went beyond mere run-of-the-mill ineffective assistance. Rather, he rendered *no* assistance to father concerning the pressing need to file a writ petition, and beyond that, by dropping out of the case without any further communication, he affirmatively prevented father from filing a petition.

These unique circumstances, which prevented father from untethering himself from a no-show attorney, "fundamentally undermined the statutory scheme" and blocked father "from availing himself . . . of the protections afforded by the scheme as a whole." (*In re Janee J.*, *supra*, 74 Cal.App.4th at p. 208.) The defect was similar to the lack of notice exception to the forfeiture rule. The intent of section 366.26, subdivision (*l*) is to encourage appellate courts to determine writ petitions on their merits in a timely way. (*Id.*, subd. (*l*)(4).) Here, father was deprived of such review, despite his best efforts to obtain it. He has not forfeited his claims.

We proceed to address father's claims on their merits, applying the following standard of review. A court's findings pursuant to section 366.21 (governing status review hearings) are generally reviewed for substantial evidence. (*In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316; see also *Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625 [substantial evidence standard of review applies to detriment finding].) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile

11

court's order, and affirm the order even if other evidence supports a contrary conclusion." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) "The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) The abuse of discretion standard of review applies to a court's order terminating reunification services. (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 565.)

*Substantial Evidence Supports the Court's Finding That Returning the Children to Father's Custody Would Create a Substantial Risk of Detriment to Their Well-being*

Father challenges the court's finding that returning I.M. and A.M. to his care would create a substantial risk of detriment to them.

At the 12-month permanency hearing, a court must return a child to a parent's care unless the social worker proves by a preponderance of the evidence that the return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f).)[4] A parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs" is prima facie evidence of detriment. (*Ibid.*) In assessing the risk of detriment, the court must consider the parent's efforts and progress "and the extent to which [the parent] availed himself or herself of services provided . . . . " (*Ibid.*) The court must "specify the factual basis for its conclusion that the return would be detrimental . . . ." (*Ibid.*)

We turn to the case before us. Undisputedly, father loves his children, has consistently visited them, and has made some efforts to overcome his substance abuse problem. Nonetheless, substantial evidence supports the court's finding that returning

---

[4] SSA argues father forfeited this contention by failing to ask the court to return the children to his custody at the 12-month hearing. Not so. When a parent claims that a judgment is not supported by substantial evidence, he or she "is not required to object to the agency's failure to carry its burden of proof." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.)

I.M. and A.M. to father's care would have created a substantial risk of detriment to their physical and emotional well-being. As the trial court noted, father failed to make sufficient progress in his case plan and failed to overcome the alcohol abuse that was one cause of the children's dependency. Indeed, on appeal father acknowledges, as he must, that his effort to comply with the substance abuse components of his reunification case plan was "belated." Nor did father perceive a true need to overcome such abuse since he did not believe he had a drinking problem.

On appeal father minimizes the significance of the evidence he had not internalized a need for substance abuse treatment. He argues that, regardless of whether he actually believed he needed treatment, "no substantial evidence linked [his] historic substance use to a risk of harm to the minors at the time of the 12-month-review hearing." Obviously, however, parenting a child requires a significant commitment that goes beyond showing up sober at visits twice a week. Father's inability to appreciate or care about the risk posed by his substance use is part of the problem.

Substantial evidence supports the court's finding returning the children to father's custody would have created a risk of detriment to their well-being.

*Substantial Evidence Supports the Court's Finding It Was Unlikely the Children Would Be Returned to Father's Care if the Case Were Continued*

Father challenges the court's implied finding that extending his reunification services was unlikely to result in the return of the children to his care. (*Peoplev. Zamudio* (2008) 43 Cal.4th 327, 342 [appellate courts accept factual inference in support of the trier-of-fact's decision].)

If the court does not return a child to the parent's custody at the 12-month hearing, the court may continue the case for up to six months, so long as the permanency review hearing takes place within 18 months from when the child was originally taken from the parent's physical custody. (§ 366.21, subd. (g)(1).) The court may continue the case only if it finds a substantial probability the child will be returned to the parent's

13

physical custody and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent. (*Ibid.*) In order to find a substantial probability the child will be returned to the parent's physical custody and safely maintained in the home within the extended period of time, the court must find that the parent" has consistently and regularly contacted and visited with the child" (*id.*, subd. (g)(1)(A)), "has made significant progress in resolving problems that led to the child's removal from the home" (*id.*, subd. (g)(1)(B)), and "has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs" (*id.*, subd. (g)(1)(C)).

Substantial evidence supports the court's express and implied findings that (1) extending father's reunification services was unlikely to result in the return of the children to his care, (2) father failed to make significant progress in resolving problems that led to the children's removal from the home, and (3) father failed to demonstrate the capacity and ability both to complete the objectives of his treatment plan and to provide for the children. This evidence is recited in the facts of this opinion and discussed in the preceding section. Furthermore, over 15 months elapsed between June 7, 2012 (when the children were originally taken from the parents' physical custody) and September 20, 2013 (when the court made its orders at the 12-month hearing). Thus, the court was authorized under section 366.21, subdivision (g)(1) to extend father's services for only two and one-half months. "[T]o warrant extension of the time a child must wait for stability and permanency beyond the six-month or 12-month target dates, there must exist more than just mere hope additional services will facilitate reunification." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1060.) Moreover, infants and toddlers have "'unique developmental needs'" and "'moving to permanency more quickly is critical'" for them. (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612.) The court did not abuse its discretion by terminating father's reunification services.

14

DISPOSITION

The postjudgment order terminating father's parental rights is affirmed, as are the court's orders at the 12-month hearing.


IKOLA, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.